IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THREE LOWER COUNTIES | : | |
| COMMUNITY SERVICES, | : | |
| INC., | : | |
|     Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF MARYLAND | : | Civil Action No.  AMD 05-1280 |
| DEPARTMENT OF HEALTH | : | |
| AND MENTAL HYGIENE and | : | |
| ANTHONY MCCANN, | : | |
|     Defendants | : | |

..o0o..

MEMORANDUM OPINION

Claiming violations of the federal Medicaid law, plaintiff Three Lower Counties

Community Services, Inc. (TLC), a "federally qualified health center" (FQHC), has filed a

three-count "Complaint for Injunctive and Declaratory Relief" against the Maryland

Department of Health and Mental Hygiene and its Secretary, Anthony McCann (together,

DHMH).[1] It is settled that an FQHC such as plaintiff may enforce its entitlement to prompt

reimbursement for care rendered to patients under the Medicaid law in an action brought

pursuant to 42 U.S.C. § 1983. *See Rio Grande Community Health Center, Inc. v. Rullan,* 397

F.3d 56, 72-75 (1st Cir.2005). Jurisdiction exists under 28 U.S.C. §§  1343(a)(3) and (4),

1331.

TLC is dissatisfied with many of DHMH's practices, however, its primary complaint

is that DHMH's payments are not made in a timely fashion and do not reimburse TLC for

---

[1]Defendants do not object to the presence of DHMH (as opposed to solely its Secretary)
as a party here.

the full amount to which it is entitled under federal law.[2] Discovery has concluded and the

parties have filed cross motions for summary judgment. The court held an oral hearing and

the parties have made supplemental submissions. For the reasons stated herein, plaintiff's

motion shall be denied and defendants' motion shall be granted.[3]

---

[2]The complaint purports to allege three claims: (1) an ostensible claim on behalf of
Medicaid beneficiaries; (2) the "failure-to-pay" claim discussed in text; and (3) a mixed claim
asserting that DHMH's administration of the Medicaid program deprives TLC of "patients and
revenue" and deprives Medicaid beneficiaries "of FQHC services." All but claim two may be
disposed of quickly in favor of DHMH.

First, TLC's complaint that DHMH accepts claims for payment only through managed
care organizations (MCOs) rather than directly from the FQHC fails to state a claim upon which
relief can be granted. Neither TLC nor this court has the right or the competency to decide for
DHMH how its claims validation and payment systems should operate.

Second, TLC's complaint that defendants' use of a calculated "market rate" for
reimbursements effectively deters MCOs from entering into contracts with FQHCs similarly fails
to state a claim. DHMH is perfectly entitled to set a rate floor for FQHCs consistent with the
command of 42 U.S.C. § 1396b(m)(2)(A)(ix).

Third, TLC has attempted to persuade this court that DHMH, with federal authorization,
has established a compulsory managed care system for Medicaid beneficiaries, but that
regardless of TLC's status as an "in-network" or an "out-of-network" provider, it should be paid
by either the MCO or the state for all visits by Medicaid beneficiaries presenting urgent, but not
emergency, conditions. It is difficult to imagine how either the State or the MCOs could induce
compliance with the system of managed care if not by refusing to pay claims when patients have
sought, and MCOs have provided, services outside the patient's provider network. The right to
refuse payment for "out-of-network" medical services is a fundamental and necessary part of the
system of managed care. Accordingly, one must assume that when this system was approved by
the Centers for Medicaid and Medicare Services, it was anticipated and intended that this
approach would be taken.

Finally, TLC plainly lacks standing to advance any claims on behalf of its patients or
Maryland's MCOs.

[3]Summary judgment is appropriate when the "pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and the moving party is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(c). While any material factual dispute between the parties will require
the denial of summary judgment, "[o]nly disputes over facts that might affect the outcome of the
suit under the governing law will properly preclude the entry of summary judgment." *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the facts and reasonable inferences
therefrom are viewed in the light most favorable to the non-moving party, a properly supported

(continued...)

I.

The centerpiece of TLC's claims is that it is not reimbursed timely and in full for the services it provides to Medicaid beneficiaries in violation of the Medicaid law and regulations thereunder. In particular, TLC does not receive full payment for its services until DHMH performs a "reconciliation" approximately a year after the close of the quarter in which the services were furnished. According to TLC, this procedure contravenes the requirement that FQHCs receive supplemental payments from the State "in no case less frequently than every four months." 42 U.S.C. § 1396a(bb)(5). I do not read this section to place the same constraints on DHMH that TLC contends it does, and for the reasons that follow, summary judgment shall be granted in favor of defendants with regard to this claim.

II.

This case bears remarkable similarities to *Rio Grande Community Health Center, Inc. v. Rullan, supra*, and so I set forth that court's summary of the background legal framework in which claims for prompt reimbursement, such as that asserted here by TLC, arise:

> The Medicaid program, which was begun in 1965, is jointly supported with federal and state funds and directly administered by state governments: the purpose is to provide medical assistance to indigent families with dependent children, as well as indigent disabled, blind, and aged individuals. 42 U.S.C. §§ 1396 *et seq.* . . . . A state need not participate in Medicaid, but once a state decides to participate, it must comply with all federal requirements.

---

[3](...continued)

motion for summary judgment cannot be defeated by mere denials or allegations. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578-88 (1986), *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). It is also appropriate to grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

One such federal requirement is that a state must provide, as a part of its Medicaid plan, certain types of health services. 42 U.S.C. §§ 1396a(a)(10). For example, a state must provide "Federally-qualified health center services." 42 U.S.C. § 1396a(a)(10)(A); 42 U.S.C. § 1396d(a)(2)(C). Such services can, by statutory definition, only be provided by "Federally-qualified health centers" (FQHCs) . . . .

Federal law regulates in great detail the ways in which FQHCs receive payment for the services that they provide to Medicaid patients. The special provisions on FQHC reimbursement reflect the important public health role that these centers play. The FQHC reimbursement scheme has changed several times, most recently on January 1, 2001. The system in place between 1989 and 2000 required that FQHCs be reimbursed for "100 percent . . . of [each FQHC's] costs which are reasonable." 42 U.S.C. §§ 1396a(a)(13)(C) (repealed 2000).

A new system, which relieved centers of having to supply new cost data every year, was put in place after fiscal year 2000. The new system, which is the focus of this action, is referred to as the prospective payment system (PPS). The first step is to calculate each center's total cost of providing Medicaid services for two years, 1999 and 2000. FQHCs must submit detailed cost reports and only "reasonable" costs can be considered. 42 U.S.C. §§ 1396a(bb)(2). The total reasonable costs for 1999 and 2000 are then divided by the total number of visits by Medicaid patients in those two years to obtain an average per visit rate. *Id.* This 1999 and 2000 per visit cost data becomes the baseline cost data that will be used for all future years. 42 U.S.C. §§ 1396a(bb)(2)-(3).

To obtain a center's reimbursement for fiscal year 2001, this per visit average cost from 1999 and 2000 is multiplied by the number of Medicaid visits in fiscal year 2001. 42 U.S.C. §§ 1396a(bb)(2). In subsequent years (fiscal year 2002, etc.), the per visit average cost of 1999 and 2000 is first multiplied by a Medicare Economic Index ("MEI"-a standard measure of inflation) and then multiplied by the number of visits in those succeeding years. The amount of the per visit payment thus automatically  rises every year, because of the MEI, and costs are no longer re-audited every year as the 1999 and 2000 per visit cost figures are the baseline for the calculation. New visit data, of course, is necessary for each new year. A state may only deviate from the very specific payment methodology of the PPS if the FQHC involved gives its consent and there is no reduction in total payments made as compared

to the PPS method. 42 U.S.C. §§ 1396a(bb)(6) . . . .

The system of states reimbursing FQHCs for their Medicaid costs is complicated considerably by the fact that many states . . . use a managed care approach to running their Medicaid system. Essentially, the state Medicaid agency contracts with managed care organizations (MCOs, commonly known as health maintenance organizations or HMOs) to arrange for the delivery of health care services to Medicaid patients. The state generally pays each MCO a fixed monthly sum per Medicaid patient assigned to the MCO; in return, the MCO agrees to provide all covered services to the individual. The MCO turns a profit if its costs are less than the fixed monthly sum, and has a loss if its costs are more than the fixed monthly sum. Unless the MCO actually owns hospitals and clinics, it then must contract with various health care providers, including FQHCs, in order to actually provide services to Medicaid patients.

A problem arises when the MCO contract with the FQHC gives the FQHC less than the amount of compensation it is supposed to get according to the detailed per visit PPS reimbursement method outlined above. Congress has dealt with this problem by providing that states must pay FQHCs a supplemental or wraparound payment to make up the difference between what the MCO is paying the FQHC and what the FQHC is entitled to via the detailed PPS methodology. 42 U.S.C. §§ 1396a(bb)(5). Such wraparound payments must be made at least three times each year. *Id.* Thus, even in a managed care system like Puerto Rico's, FQHCs are protected and must receive reimbursements equal to the PPS methodology that Congress has laid out. Since Puerto Rico uses a managed care system, FQHCs will get Medicaid payments from two sources: first, the MCO, and second, a wraparound payment from the Commonwealth.

397 F.3d 61-62 (some alterations added; footnotes omitted). Whereas the claim of the FQHC in *Rullan* was that Puerto Rico had failed to put in place *any* system as required by Congress to make "wraparound" payments to FQHCs, TLC's complaint here is based on its dissatisfaction with the system that DHMH has actually put in place.

III.

As mentioned above, TLC challenges the validity of the procedural strictures by

which FQHCs are reimbursed for their services to Medicaid beneficiaries in Maryland.[4]

That process, in broad terms and without a dispute between the parties, is as follows.

At the start of each quarter, TLC receives a "prospective interim supplemental

payment" for services not yet rendered.[5] This sum is DHMH's estimate of how much will

be due to the FQHC for services rendered to Medicaid beneficiaries during that period.[6] Over

time during the quarter, TLC treats patients and, in the case of a patient receiving Medicaid

benefits, submits a claim for payment to the patient's MCO. The MCO then evaluates the

claim and, if it is approved, pays TLC a "market rate" payment for the services.  The MCO

then passes the claim on to DHMH, which is responsible for ensuring that TLC receives its

"wraparound" or supplemental payment as required by 42 U.S.C. § 1396a(bb)(5). DHMH

issues a quarterly statement to TLC indicating the claims received and treatment of each.

Finally, approximately 12 months after the close of the period, DHMH performs a

---

[4]TLC is the only healthcare provider in Maryland that could be affected by the outcome of this action because every other FQHC (13 in total) has voluntarily agreed to receive reimbursement via DHMH's "Alternative Payment System" (APS).  Despite DHMH's repeated mention of the APS's virtues, TLC's right to a functioning payment system is not contingent upon its willingness to participate in the APS. The decisions of other FQHCs regarding the APS are of no consequence here as this court's only concern is to evaluate the adequacy of DHMH's primary payment system, which TLC is entitled to use and which must comply with Congressional mandates.

[5]TLC indicates that the prepayment is sometimes made during the quarter rather than at its start.  This distinction is immaterial for the present analysis as the plaintiff does not contend that the "advance" is made after the close of the quarter and certainly not outside the four-month window established by § 1396a(bb)(5).

[6]DHMH uses historical data from TLC to predict the expected activity in the upcoming quarter, determines the amount of supplemental payment DHMH is expected to owe for that period, and pays this amount to TLC in the prospective interim supplemental payment.  TLC refers to this payment throughout the filings as an "advance."

reconciliation of each six month period to determine the total amount of overpayment or underpayment to TLC.[7]

IV.

The section of the Medicaid Statute which TLC claims DHMH has violated is 42 U.S.C. § 1396a(bb)(5). Subparagraph (A) establishes the "wraparound" payment structure by which the state is required to make up any shortfall between the amount paid by an MCO to a FQHC for services to the MCO's member and the pre-established value of those services. 42 U.S.C. § 1396a(bb)(5)(A). Subparagraph (B) demands that the payments required under (A) be made "in no case less frequently than every 4 months." *Id*.

TLC reads this language to indicate that the supplemental payment is due to them, in full, within four months of some particular date, presumably either the date of service or the close of the quarter. To the contrary, DHMH contends that, by supplying the estimated advance payment, it has substantially met the command of the statute. Furthermore, DHMH contends that, if the statute required payment in full as TLC reads it, the requirement would be impracticable, if not impossible, in execution. The question presented to the court is whether it is acceptable under § 1396a(bb)(5) for the state to owe an FQHC part of their supplemental payment from the time of service until reconciliation is complete, potentially over a year later.

---

[7]It is noteworthy that the amount of adjustment required at the time of reconciliation has not been a substantial portion of the total amount due TLC. While there have been periods in which DHMH was required to pay additional funds, these correlated with periods in which the number of Medicaid visits at TLC increased, an occurrence which DHMH cannot be expected to anticipate in its prepayment.

In view of the current realities of Medicaid administration, it would seem impossible for DHMH to supply payment in the manner TLC insists is required by the statute.[8] Absent a more compelling demonstration that Congress, in enacting § 1396a(bb)(5), intended to saddle state governments with such burdensome requirements, I am loath to accept TLC's interpretation.

In reviewing claims that a state agency's interpretation of a federal mandate has been erroneous, courts are slow to substitute their own judgment for that of the agency. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978); *Newport News Shipbuilding and Dry Dock Co. v. Howard,* 904 F.2d 206, 209 (4th Cir. 1990). "To survive judicial scrutiny, an agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation. Rather, a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (internal citations omitted). Accordingly, unless it can be said that DHMH's protocols are clearly inconsistent with Congressional intent, they should be left undisturbed.

Under the undisputed facts here, it cannot be said that the payment structure designed and administered by DHMH contravenes either the plain language of § 1396a(bb)(5) or

---

[8]First, there is the difficulty that the providers themselves have nine months within which to file a timely claim. COMAR 10.09.36.06. While DHMH could reduce this window to something less than four months, there would nonetheless be the difficulty that the claim must be evaluated and acted on by the MCO before it even enters DHMH's hands. Furthermore, given the number of parties and the complexity of the procedures involved in the claims process, it would appear to be difficult, if not impossible, for DHMH to guarantee payments to FQHCs within four months of a patient encounter.

Congress' underlying intent. DHMH's quarterly prepayment methodology has supplied TLC with a consistent stream of income.  Furthermore, to the limited extent that DHMH has owed TLC additional reimbursement at the time of reconciliation, the record shows that this debt has been consistent with increases in the number of Medicaid visits provided by TLC, not any form of deliberate or recklessly inattentive underpayment on the part of the State.

DHMH appears to have taken practical steps which, in its judgment, effectuate the command of § 1396a(bb)(5).  These proceedings have given the court no reason to discredit the State's judgment or to insert itself in the administration of Medicaid in the state of Maryland.

## V.

In the absence of any evidence that DHMH's procedures violate the requirements of the Medicaid statute, summary judgment shall be granted in favor of defendants. An Order follows.


Filed: April 14, 2006                                   _____/s/_____
                                                        Andre M. Davis
                                                        United States District Judge